**Marc B. GOODMAN, Plaintiff,**

v.

**PRAXAIR SERVICES, INC., Defendant.**

**Case No. MJG–04–391.**

United States District Court, D. Maryland.

July 7, 2009.

Marc B. Goodman, North Beach, MD, pro se.

Erin M. Shoudt, Amy L. Bess, Sonnenschein Nath and Rosenthal LLP, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

PAUL W. GRIMM, United States Magistrate Judge.

This Memorandum Opinion resolves Plaintiff Marc Goodman's ("Plaintiff," or "Goodman") Motion for Holding of Spoliation Sanctions by Defendant and for Associated Relief (with Application to Motions for Summary Judgment), Paper No. 138, Defendant Praxair Services, Inc.'s ("Defendant," or "Tracer/PSI") Memorandum in Opposition to Plaintiff's Motion for Spoliation Holding and Request for Specific Inferences, Paper No. 139, and Plaintiff's Reply to Defendant's Opposition to Motion for Holding of Spoliation and for Associated Relief, Paper No. 140.[1] Goodman, a *pro se* litigant, has filed suit for breach of contract against Tracer/PSI, who is the successor in interest to the Tracer Research Corporation ("Tracer"). Tracer purportedly hired Goodman to participate in a project to exempt Tracer's products from the Environmental Protection Agency ("EPA") fuel testing requirements; however, after the exemptions were obtained, Tracer refused to pay an additional $50,000 ("success fee") to Goodman. *See* Pl.'s Compl. ¶¶ 4–22, Paper No. 2. Whereas Goodman argues his involvement in the project was critical to its success, Tracer/PSI contends other third-party consultants were solely responsible for obtaining the exemptions; therefore, Tracer was not obligated to pay Goodman the success fee. *See* Def.'s Am. Answer ¶¶ 43–44, Paper No. 55. In Goodman's Motion for Holding of Spoliation Sanctions, he argues the following: (1) Tracer reasonably should have anticipated litigation and preserved evidence relevant to the underlying dispute after April 1999, November 1999, March 2000, or December 2000; (2) Tracer's chief executive officer Shannan Marty ("Marty"), Goodman's main contact on the project, deleted all relevant documents from her computer "while selectively preserving hard copies"; (3) Tracer failed to issue a litigation hold to its "key players" and third-party consultants; (4) Tracer destroyed employees' computers after the duty to preserve was triggered; (5) internal communications and emails of Tracer employees were not preserved; and (6) Tracer/PSI's failure to search disaster recovery tapes and compact discs constitutes destruction of evidence. Pl.'s Mem. Supp. 2–24, Paper No. 138–2. Tracer/PSI contends: (1) Goodman's Motion is untimely; (2) the duty to preserve did not arise until February 19, 2001; (3) Marty was the sole key player at Tracer, and she properly instituted a litigation hold once the duty to preserve arose; (4) there was no duty to preserve the computers of the Tracer employees or files of third-party consultants; and (5) Goodman failed to provide any authority to show Tracer/PSI's failure to search the disaster recovery tapes and compact discs constituted spoliation. Def.'s Resp. 3–23.

1. On April 10, 2008, this case originally was referred to me for resolution of discovery disputes. Paper No. 81. On March 31, 2009, this case was referred to me to conduct a settlement conference. Paper No. 151. In order to ensure that this Memorandum Opinion was based entirely on materials filed in court by the parties, it was prepared prior to reviewing the *ex parte* submissions of Goodman and Tracer/PSI. Accordingly, nothing in those submissions had any impact on the rulings in this Memorandum Opinion. *See Proa v. NRT Mid Atlantic Inc.*, 608 F.Supp.2d 690, 693–94 (D.Md.2009) (holding a magistrate judge may preside over discovery matters and conduct a settlement conference as long as there is no reasonable factual basis to doubt the magistrate judge's impartiality).

Goodman further argues that the destruction of evidence by Tracer/PSI was done in bad faith; therefore, he requests that the Court grant summary judgment in his favor. *See* Pl.'s Mem. Supp. 25. In the alternative, Goodman requests that the Court issue a general adverse jury instruction or a series of fact-specific adverse jury instructions at trial. *See id.* at 24–28; *see also* Pl.'s Mem. Specific Inferences 3–22, Paper No. 138–3. Goodman also requests that his "discovery costs should be reimbursed by [Tracer/PSI], along with all costs related to [the instant Motion] and the spoliation issue." Pl.'s Mem. Supp. 29. Conversely, Tracer/PSI asserts that even if it did destroy evidence, Goodman cannot prove that the evidence would be relevant to supporting his claim. Def.'s Resp. 26–27. As such, Goodman's Motion should be denied, and Goodman should be sanctioned for filing an " 'unjustified sanctions motion.' " *Id.* at 2 n. 1 (quoting D. Md. Local Rule 105(8)(a)).

In order to rule on the pending Motion, I requested that the parties provide certain additional information, which they did. *See* Paper Nos. 145 & 152. Accordingly, the matter is fully briefed and ripe for resolution, and a hearing is not necessary. *See* D. Md. Local Rule 105(6). For the reasons stated below, I make the following findings: (1) Goodman's Motion was timely filed; (2) Tracer reasonably should have anticipated litigation on January 5, 2001, and its duty to preserve evidence relevant to Goodman's claim commenced on that date; (3) the duty to preserve applied to Marty and other key players at Tracer; (4) Tracer was not obligated to issue a litigation hold to third-party consultants or preserve any documents or records prepared by third-party consultants; (5) Tracer/PSI's failure to search backup tapes did not constitute spoliation of evidence; (6) Tracer/PSI did not act in bad faith in its destruction of evidence; (7)

Tracer/PSI was negligent in its failure to issue a litigation hold to key players; (8) Tracer/PSI acted willfully in its destruction of Marty's laptop, and knew of the relevance of the laptop to Goodman's claim; (9) Marty acted willfully when she deleted emails in violation of the duty to preserve, and knew of the relevance of the emails; (10) Goodman's request for summary judgment or a series of fact-specific adverse jury instructions must be denied; and (11) Goodman's request for a general adverse jury instruction as to Tracer/PSI and Marty's actions, as more fully explained below, is granted. Further, Goodman will be permitted to file with a Court a list of his reasonable expenses associated with the resolution of the issues in his favor that he incurred as a result of filing the instant Motion.

## I. Background Facts

Tracer, a Tucson, Arizona company, developed technology and provided services for detecting and identifying leaks in containers that could store various chemicals, including fuel. Def.'s Mot. Summ. J., Ex. 1 ¶ 3, Paper No. 111–4. Specifically, through its patented "TracerTight" leak detection process, minute quantities of chemical "tracers" were injected into fuel storage containers in order to "facilitate the rapid detection and location of fuel leaks." *Id.* ¶ 5. In April 1997, Tracer discovered that several of its tracers, which had been registered as "fuel additives" with the EPA, could be subject to the Clean Air Act regulations' "Tier 1" and "Tier 2" testing requirements. Def.'s Mem. Supp. 4, Paper No. 111–2; *see also* 40 C.F.R. §§ 79.1 *et seq.* Under the Clean Air Act regulations, companies that manufacture fuel additives are required to register the chemicals with the EPA before they are eventually sold in commerce. *Id.* § 79.4. Further, to complete the registra-

tion process, a company must ensure the fuel additives undergo Tier 1 and Tier 2 testing. *Id.* § 79.51. Under Tier 1, manufacturers must supply "the identity and concentration of certain emission products," "information regarding the health and welfare effects of the whole and speciated emissions of such fuels or additives," a "characterization of the emission products," and a "literature search" on the "potential toxicological, environmental, and other public welfare effects of the emissions of such fuels and additives." *Id.* § 79.52(a)-(g). Under Tier 2, manufacturers must perform extensive animal testing to determine pulmonary, carcinogenic, and mutagenic effects of the fuel additives, as well as their general toxicity. *Id.* § 79.53(a)-(d). After learning that its tracers could be subject to the Clean Air Act testing requirements, Tracer immediately retained Envirolytical, a consulting firm, to make an emergency Tier 1 submission. Tracer eventually discontinued work with Envirolytical, and retained EA Engineering ("EA") to complete the submission. Pl.'s Mot., Marty Dep. 23:30–24:3, 37:8–11 [hereinafter Marty Dep.].[2] Fully aware that the cost of future Tier 1 and Tier 2 testing requirements could exceed "a million dollars," Tracer also sought to examine whether the tracers could be ex-

empt from the Clean Air Act regulations. *Id.* at 42:18–21, 47:2–48:2.

Goodman, a consultant with EA, voluntarily left the company to work with Tracer on securing the exemptions. Def.'s Mot. Summ. J., Ex. 2 at 56:10–15, Paper No. 111–12 [hereinafter Pl.'s Dep.]. After months of negotiations, Marty, the CEO of Tracer, and Goodman executed a contract, which provided:

> [Goodman proposes] that for each of the six tracers for which [he] successfully negotiate[s] with EPA not to have to perform Tier 2 testing for use with gasoline and/or diesel fuel, Tracer will pay a fee of $25,000. If [Goodman is] also successful in removing the tracers from Tier 1 coverage, another $5,000 per tracer would be paid.

Def.'s Mot. Summ. J., Ex. 7 at 2, Paper No. 111–17. Tracer also was obligated to pay $10,000 to Goodman when he performed a "package of services," which included drafting a letter or petition outlining the justification for exempting the tracers, meeting with key EPA officials to discuss the submission, and participating in any follow-up meeting to respond to any queries of the regulators. *Id.* at 3. Finally, the success fee of $50,000 would be paid to Goodman if he was successful in "removing the tracers from the sec. 211(f) waiver requirements."[3] *Id.* at 3–4.

---

**2.** Any exhibits (including depositions, correspondence, and other materials) filed with the Court as part of Goodman's Motion were not submitted via the Court's electronic CM/ECF filing system. As a result, all of the citations to Goodman's exhibits in this Memorandum Opinion will not have the accompanying Paper Numbers that are generated when exhibits are filed electronically. Further, in order to provide an accurate and thorough review of the facts of this case, I will frequently cite to pleadings, motions, exhibits, and attachments previously filed by the parties.

**3.** Generally, under "section 211(f)" of the Clean Air Act, 42 U.S.C. § 7545(f)(1) (2009), a

manufacturer of any fuel or fuel additive is prohibited from introducing into commerce, or from increasing the concentration in use of, any fuel or fuel additive manufactured after model year 1974 that is not "substantially similar to any fuel or fuel additive utilized in the certification of any model year 1975, or subsequent model year...." Section 7545(f)(4) notes such prohibitions may be waived if an applicant can establish "the emission products of such fuel or fuel additive ... will not cause or contribute to a failure of any emission control device or system...." *Id.*

On October 2, 1998, Goodman submitted his petition to the Air Office of the EPA. Pl.'s Mot., Ex. O at 2. On October 21, 1998, Goodman met with David Kortum ("Kortum") and Jim Caldwell ("Caldwell"), two EPA employees, and Keith Matthews ("Matthews"), of the EPA General Counsel's Office, to discuss the arguments raised in the petition. *Id.* at 4. Following this initial meeting, Goodman provided additional memoranda to Kortum, Caldwell, and Matthews to elaborate on some of the arguments raised in the original petition. *Id.* at 8–9. Tracer concluded Goodman satisfactorily had performed his "package of services," and accordingly paid Goodman the $10,000 required under the contract. Pl.'s Dep. 167:19–168:7.

In January 1999, Caldwell informed Goodman that Tracer would have to modify its original Tier 1 submission and perform a minimized, alternative form of Tier 2 testing. *Id.* at 224:4–9. However, Margo Oge ("Oge"), the Director of the EPA's Office of Mobile Sources, disagreed with revising the testing requirements. *Id.* at 236:18–20. Consequently, Tracer and Goodman strategically revised their approach to the project. Rather than explain why the tracers were not fuel additives, Goodman hoped to show the tracer process was "critical" to preventing fuel from leaking into the environment, thereby justifying the exemption of the tracers from the testing requirements. *Id.* at 280:18–281:2. Further, any legal arguments in the original petition would be bolstered by additional research. *Id.* at 281:3–8. Goodman also suggested to Kortum that no meetings occur with Oge "until further consultations have determined [Tracer's] next steps." Pl.'s Mot., Ex. O at 10. Similarly, in April 1999, Marty informed Goodman that he was to have no further contact with the EPA unless he had refined a "complete strategy" on ex-

empting the tracers. Marty Dep. 381:12–19.

In March 1999, Goodman worked with an attorney to develop a legal memorandum to submit to the EPA. Goodman ultimately was dissatisfied with the attorney's final product and recommended that Tracer not submit it to the EPA. *See* Pl.'s Dep. 269:6–270:13, 305:20–308:9, 313:16–315:22. Goodman then recommended that Tracer retain the National Legal Research Group ("NLRG") to revise the legal memorandum; however, Goodman disagreed with the assertions made in NLRG's memorandum, and it was never submitted to the EPA. *Id.* at 365:7–372:22.

Tracer then retained Mary Gade ("Gade"), an attorney who formerly worked with the EPA. At Gade's request, Tracer contacted Richard Wilson ("Wilson") and Marc Himmelstein ("Himmelstein"), consultants with National Environmental Strategies ("NES") in Washington, D.C. Wilson previously had worked at the EPA from 1970 to 1998, and was Oge's supervisor when she was appointed to be the Director of the EPA's Office of Mobile Sources. Pl.'s Mot., Wilson Dep. 100:19–101:15 [hereinafter Wilson Dep.]. Based on Wilson's previous relationship with Oge and his knowledge of the inner-workings of the EPA, Tracer retained him to work on the project in January 2000. *See* Wilson Dep. 39:3–7; *see also* Def.'s Mot. Summ. J., Ex. 1, Attach. A, Paper No. 111–5.

As a result of the extended delays in obtaining the exemptions from the EPA, Goodman requested a $20,000 advance against the success fee. In a November 19, 1999 email, Marty noted that she "was amenable to modifying [Goodman's] contract for some payments now." Def.'s Resp., Ex. 9 at 3, Paper No. 139–10. Marty also informed Goodman of "the need to rework the contract if [Gade] [was] the one primarily responsible for achieving success

with EPA." *Id.* In a responsive email, Goodman stated "he had not previously understood that bringing [Gade] on board made her 'the one primarily responsible for achieving success with EPA.'" *Id.* at 1. Rather, Goodman had regarded her "as a partner in effort." *Id.* Although Goodman was aware of Gade's ability to make "high level contacts" and set "up the meetings" with key EPA officials, he believed that he "should continue to be the one primarily responsible for working out the mechanics of a solution...." *Id.* Further, Goodman viewed Gade's participation only "as an additional asset to lower the risk of failure." *Id.* Finally, Goodman told Mary that "the work [he had] done and the time that the project ha[d] taken [had] already changed the nature of the success fee from being a windfall for success to being essentially a recovery of what [he] would have billed had the work been done on an hourly basis at [his] normal rate for [that] type of work...." *Id.* at 2. In a November 24, 1999 email, Marty approved Goodman's request for an advance and noted the "need to modify the contract to allow for a partial payment." *Id.* at 1. Despite this concession, there is nothing in the record that shows that Marty ever modified Goodman's contract to provide for a partial payment.

In a March 5, 2000 email, Goodman requested an update from Marty on the project. Pl.'s Mot., Ex. U at 2. In a March 6, 2000 email, Marty told Goodman that Wilson had met with Kortum, Caldwell, and Matthews. *Id.* On that same day, Goodman sent a response email, and inquired why he "was not included in the meeting [Wilson] had with [the EPA officials]." *Id.* at 1. Goodman stated that he had thought there were going to be "additional strategy sessions before further meetings with EPA, as [he] had been holding off contacting them for the last year or so until [Tracer] had a strategy in place." *Id.*

Marty responded, stating, "I am comfortable with the direction we are going and how it is being pursued. I believe your knowledge and background will be critical when it comes to figuring out how to get us out of the regulatory web." *Id.* Further, Marty reportedly believed that the meetings with the EPA that Goodman did not attend were "merely sowing the seed to create the desire within the upper levels of EPA [to exempt the tracers]." *Id.* Goodman sent a responsive email, and stated, "My problem is with meeting at the staff levels of EPA, which could conceivably prejudice any future effort I may have to make with them." *Id.* Goodman also stated, "As you know, I have [a] considerable stake in the outcome of this and would be very distressed if things proceeded without my participation or concurrence and the result was unfavorable." *Id.* Goodman said that he would assume there would not "be any problem regarding the contract if it [succeeded], even with me on the sidelines. But if it [was] out of my hands and [failed], that would create some real questions for us to resolve." *Id.* Goodman added that if Wilson and Gade were to somehow "blow it, that would almost certainly make it impossible for me to straighten [it] out after the fact and I would have been deprived of the chance to perform under our contract...." *Id.*

Wilson and colleagues purportedly participated in meetings with Oge, Kortum, and officials from the EPA's Office of Solid Waste and Emergency Response. *See* Def.'s Mot. Summ. J., Ex. 32, Paper No. 111–42. In October 2000, Wilson drafted a letter to the EPA's Office of Research and Development ("ORD") to address concerns regarding the health effects of the tracers. Def.'s Mot. Summ. J., Ex. 1, Attach. F at 3–4, Paper No. 111–11. After the ORD received the letter, the ORD "recommended[ed] to [Oge] that from [this] of-

fice's view the Tracer approach [was] very useful and [seemed] okay given [Oge's] suggested limits." *Id.* at 1.

In a December 19, 2000 letter, Oge informed Tracer that the "tracers [were] not fuel additives"; therefore, the tracers would not be required to undergo Tier 1 and Tier 2 testing. *See* Def.'s Mot. Summ. J., Ex. 34, Paper No. 111–44. During the last week of December 2000, Marty allegedly called Goodman and informed him that he was not ultimately responsible for the project's success, and Tracer would not pay him any remaining portion of his success fee. *See* Pl.'s Mot., Goodman Decl. 2. Goodman further alleges that Marty offered to let him keep the $20,000 advance in exchange for a full release of all claims, and that she would immediately send him a draft of the release. *Id.* Additionally, Goodman argues that Marty requested that he draft a letter outlining the payment estimates for the amount of work he had done. *Id.* In a January 5, 2001 letter, Goodman stated that he had consulted with two attorneys regarding the dispute, one of whom suggested he was entitled to "$230,000" under the law, and if he was "forced to litigate," then he would be awarded "treble this amount based on a recent line of cases." *See* Def.'s Resp., Ex. 10 at 9, Paper No. 139–11. Goodman also alluded to the supposed telephone call with Marty, stating, "I want to point out that some of the statements you made to me on the telephone last week are hard to see as representing good faith. These include . . . tell[ing] me 'accept $20,000 today or we won't give you anything and you can sue us.' I am sure that such statements will not be helpful to resolving this matter and will not further the interests of Tracer." *Id.* at 10. In a January 10, 2001 faxed invoice, Goodman provided an itemized list of costs equal to $230,000. Def.'s Resp., Ex. 11 at 2, Paper No. 139–12. On the fax cover sheet, he stated, "Remem-ber—'Fast pay makes fast friends.'" *Id.* at 1.

In a February 19, 2001 letter, Goodman markedly ratcheted up the dispute and claimed that Tracer had exempted "ten tracers" from the EPA testing requirements; therefore, he contended that his success rate, and requisite success fee, would need to be increased. Def.'s Resp., Ex. 12 at 1–2, Paper No. 139–13. Goodman further stated that "no good can come to Tracer from litigating this rather than paying off what it owes me. If I am forced to turn this over to attorneys, they will certainly demand a greater amount, starting with the use of [ten] tracers for calculating the success fee." *Id.* at 2. Also, Goodman stated, "[O]nce I put the matter in the hands of attorneys, if I am forced to do that . . . I am sure that you will regret it for a very long time. Don't go down that road, Shannan. Pay my invoice, as you clearly owe me . . . ." *Id.* at 3.

In light of Goodman's escalating letters demanding payment and threatening to retain counsel, Marty "sought legal counsel," instituted a "litigation hold," and no longer deleted any emails she had received. Def.'s Resp. 10, 15–16. Before the litigation hold was implemented, Marty would typically delete emails from her computer after she had read them. Contrastingly, if Marty wanted to keep a record of any "relevant" email, it was printed, and placed in a file cabinet. *See* Marty Dep. 387:8–19. However, "[a]fter Goodman's February 19, 2001 letter, Marty no longer deleted documents related to the dispute, including emails, because she was not receiving additional emails relating to the 'project.'" Def.'s Resp. 16. There is no evidence that has been brought to the Court's attention to suggest that Tracer's counsel instructed Marty to implement the litigation hold, or that any other Tracer employees or consultants were advised to implement a litiga-

tion hold. *See id.* at 17 ("[T]here was no need for any company-wide formal litigation hold to preserve the evidence—because Marty preserved the evidence herself."). Particularly, Richard Golding, Ph.D. ("Golding"), a Tracer employee, Glenn Thompson, Ph.D. ("Thompson"), Tracer's founder, Gade, and Wilson never were asked to preserve evidence relating to Goodman's dispute with Tracer, despite the fact that they had some involvement in the effort to obtain the tracer exemptions. *See* Pl.'s Mot., Golding Dep. 71:20–72:6 [hereinafter Golding Dep.]; Pl.'s Mot., Thompson Dep. 47:24–48:6 [hereinafter Thompson Dep.]; Wilson Dep. 94:20–96:5; Pl.'s Mem. Supp. 17. Golding's duties were not managerial and he did not help guide the overall focus of the project; however, he was responsible for answering technical questions and providing information that would help those seeking the exemptions from the EPA understand the technical nature of the project. Golding Dep. 69:11–15. Golding also would occasionally "write documents" for Marty to resolve "[o]perational, personal, [and] technical" questions. *Id.* at 67:16–68:1. Thompson was unaware of any documents prepared by Goodman, but he had initially discussed the project with Goodman. Although Thompson wrote a November 14, 1998 introductory memorandum describing the tracers, he was never involved in evaluating Goodman's progress on exempting the tracers from the EPA regulations. Thompson Dep. 20:6–21:2, 25:25–26:19, 40:14–20. Both Golding and Thompson stated that they "[r]arely" used email to communicate with other Tracer employees. *See id.* at 46:18–19; Golding Dep. 68:2–5. Thompson purportedly never used email to communicate with Marty as their "offices were close together," and "[m]emos" were used to communicate with other employees regarding work projects. Thompson Dep. 46:20–47:2. Nevertheless, Goodman alleg-

edly used email to maintain contact with at least Golding during the project. *See* Pl.'s Reply 10 ("Goodman had preserved copies of at least fourteen email entries between himself and Randy Golding, some of which included multiple emails.").

In a February 27, 2001 letter, Tamara Meyer ("Meyer"), an attorney at Sonnenschein Nath & Rosenthal LLP ("Sonnenschein"), and one of Tracer's attorneys, wrote to Goodman and stated that there was "no [valid] claim against Tracer for 'payment of $200,000 ... or a ... success fee' or any other payment." Pl.'s Mot., Ex. I at 1. Nevertheless, Meyer told Goodman that Tracer was willing to permit him to keep the $20,000 advance he had received in exchange for executing a mutual release of any future claim. *Id.* at 2. Meyer did not receive a response from Goodman and "Tracer did not hear from Goodman again until he filed suit, [nearly three years later]." Def.'s Resp. 10.

At this point, it is necessary to discuss Tracer's electronic document retention policies. Tracer employed seven data servers, and the "i-drive" was designated as the server where employees could save work-related documents. Def.'s Resp. Ct. Order, Ex. 1 ¶ 8, Paper No. 155–2. Tracer also used the Microsoft Exchange 5.5 and Microsoft Outlook email systems. Both Tracer's i-drive and email systems were backed up nightly on disaster recovery tapes. *Id.* ¶¶ 9–10. In October 2002, Tracer was acquired by Praxair Services, Inc., a subsidiary of Praxair, Inc; therefore, Praxair became the successor in interest to Tracer. From October 2002 to December 2003, Tracer's information technology infrastructure was transferred to the Praxair system. Included in this transition process was the replacement of forty-five Tracer computers with new Praxair computers. Once the new computers were installed, data saved on the old computers

was not transferred unless requested by the employees that had used them, and the old computers were then sent to a third-party vendor to be recycled. Golding and Thompson's computers were replaced, and there is insufficient information of record to conclude that either of them requested that information stored on their old computers be preserved. The exact dates for the recycling of the computers also cannot be determined from the record before me, but "most of the computers were replaced by January 2003." Def.'s Resp. Ct. Order, Ex. 3 ¶¶ 14–28, Paper No. 155–4; *see also* Def.'s Resp. Ct. Order, Ex. 3, Attach. B. Marty was somewhat unique, as she had used a laptop computer while working at Tracer. Marty would receive "email messages in Microsoft Office Outlook and used various other applications in the Microsoft Office Suite." Def.'s Resp. Ct. Order, Ex. 4 ¶ 7, Paper No. 155–5. Also, "[w]hen [Marty] created a document, [her] normal business practice was to save it locally on [her] hard drive. [She] rarely saved documents onto Tracer's server...." *Id.* ¶ 8. After Tracer was acquired by Praxair, Marty's request to personally purchase her laptop was denied, and the laptop remained in the possession of Praxair. *Id.* ¶¶ 11–12. John Boulden, project manager for the technology transition from Tracer to Praxair, "*believe[d] [the laptop] was reimaged and given to a different employee and ultimately replaced* in the ordinary course of business as the technology became outdated." Def.'s Resp. Ct. Order, Ex. 3 ¶ 23 (emphasis added). Tracer's email systems were converted to Lotus Notes and the old email systems were taken off-line. "Any emails from the old email system[s] that were not deleted in the [ordinary course of business] would have been captured in the nightly back up process on the disaster recovery tapes...." Def.'s Resp. Ct. Order, Ex. 1 ¶ 15.

On February 13, 2004, Goodman, then represented by counsel, filed a breach of contract claim against Tracer/PSI. Pl.'s Compl. ¶¶ 4–22. In an October 27, 2004 Order, Paper No. 32, summary judgment was granted in favor of Tracer/PSI, and Goodman's claim was dismissed. Goodman successfully appealed, *see Goodman v. Praxair, Inc.*, 494 F.3d 458 (4th Cir. 2007), and the case was reinstated on October 31, 2007. *See* Paper No. 54. On December 18, 2007, Goodman filed a notice with the Court that he would proceed *pro se. See* Paper No. 62.

As discovery progressed in spring 2008, Kathryn D. Blake, the Senior Legal Assistant at Tracer/PSI, received approximately 280 disaster recovery tapes and compact discs that had been stored in the Tracer/PSI offices in Tucson, Arizona. The tapes and compact discs purportedly were "not labeled or marked in anyway," and only a portion of the tapes were marked with dates, "ranging from 1996 to 1998." Def.'s Resp., Ex. 7 ¶¶ 1–4, Paper No. 139–8. Nevertheless, Tracer/PSI continued to retain the tapes and discs. On March 10, 2008, Russell M. Shumway ("Shumway"), the Technical Director for e-Discovery and Forensics Services at Sonnenschein, traveled to Buffalo, New York, to meet with Rich Romaniak ("Romaniak"), an employee at Tracer/PSI. Romaniak was in possession of a hard drive acquired from Tracer/PSI that contained data from Tracer's i-drive. Defense counsel provided Shumway with a list of search terms to run through the hard drive. After the initial search was performed, Shumway retrieved 35,485 documents that contained one or more of the search terms. Shumway then narrowed the search to any documents created between April 1, 1998, and April 1, 2001. This search resulted in 309 documents being produced. Upon a review of the documents, Defense counsel

found that only one document was responsive to Goodman's request for production of documents, and the document was produced to Goodman. In addition, Tracer/PSI produced 2,530 pages of documents in response to Goodman's request for production of documents. Def.'s Resp. 17.

This case was then referred to me for the purpose of resolving all discovery disputes. In a June 4, 2008 Letter Order, Paper No. 106, the discovery deadline in this case was scheduled for August 15, 2008, and dispositive motions were to be filed by September 30, 2008. In an August 15, 2008 Joint Status Report, Paper No. 113, the parties stated:

> Goodman intends to file a motion relating to spoliation of evidence and associated relief. Goodman believes that evidence was not preserved and that Praxair Services knew or should have known that there was potential for litigation with Goodman. Goodman believes that such evidence destroyed is relevant to the issues of this case and will impact on the disposition of the material issues.

Additionally, in a September 29, 2008 Memorandum in Support of the Motion for Summary Judgment, Goodman stated:

> Goodman will shortly be filing a motion regarding spoliation, which will identify how Tracer should have known of a likelihood of litigation by 1999. . . . These issues will be further delineated in Goodman's coming spoliation motion and as they come up in pleadings and proceedings. Goodman asks the Court to be mindful of this in considering the pending dispositive motions, as such inferences could remove any doubt as to whether summary judgment is warranted on some issues.

Pl.'s Mem. Supp. Mot. ¶¶ 1–2, Paper No. 117–2. On January 23, 2009, Goodman filed his Motion for Holding of Spoliation Sanctions. Tracer/PSI filed a Response, and Goodman filed a Reply.

## II. Spoliation

 As recognized in *Thompson v. U.S. Department of Housing & Urban Development*, 219 F.R.D. 93, 100 (D.Md. 2003), "The failure to preserve electronic or other records, once the duty to do so has been triggered, raises the issue of spoliation of evidence and its consequences." Spoliation is "the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Id.* (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001)); *see also Sampson v. City of Cambridge*, 251 F.R.D. 172, 179 (D.Md. 2008) (citation omitted); *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 510 (D.Md.2005) (citation omitted). Under federal law, a court's authority to levy sanctions on a spoliator ultimately derives from two main sources. First, there is the "court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct 'which abuses the judicial process.'" *United Med. Supply Co. v. United States*, 77 Fed.Cl. 257, 263–64 (2007) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)); *accord Thompson*, 219 F.R.D. at 100 (quoting *Silvestri*, 271 F.3d at 590 (internal citations omitted)); *see also Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir.2009) (citations omitted); *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.2006) (citing *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337–38 (9th Cir.1985)); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir.2005); *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 191 (S.D.N.Y.2007) (citing *Phoenix Four, Inc. v. Strategic Res. Corp.*, No. 05 Civ. 4837(HB), 2006 WL 1409413, at *3 (S.D.N.Y. May 23, 2006)). Second, if

the spoliation violates a specific court order or disrupts the court's discovery plan, sanctions also may be imposed under Fed. R.Civ.P. 37. *United Med. Supply Co.*, 77 Fed Cl. at 264, cited in *Sampson*, 251 F.R.D. at 178. If spoliation has occurred, then a court may impose a variety of sanctions, ranging from dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs. *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. at 191 (citing *Chan v. Triple 8 Palace, Inc.*, No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *4 (S.D.N.Y. Aug. 11, 2005)).

Goodman has failed to identify any court order violated by Tracer/PSI in its alleged spoliation of evidence; accordingly, the Court's ability to impose any sanction must derive from its inherent authority to regulate the litigation process, rather than from any sanction prescribed by the Federal Rules of Civil Procedure. *See, e.g., Sampson*, 251 F.R.D. at 177–79 (noting defendant's alleged failure to preserve emails and electronic memoranda "implicate[d] the court's inherent authority to impose sanctions because ... [the] defendant violated the general duty to preserve relevant evidence, rather than violating a specific court order").

### III. Timeliness of a Spoliation Motion

█ Preliminarily, Tracer/PSI asserts that Goodman's Motion should be denied as untimely.[4] Citing *Media Communications, Inc. v. Multimedia, Sign Up, Inc.*, No. 99 C 5009, 1999 WL 1212652, at *4 (N.D.Ill. Dec. 14, 1999), Tracer/PSI argues that "[c]ourts have held that failure to

bring [spoliation] claims for over four months justifies their denial." Def.'s Resp. 4. In response, Goodman contends that his repeated references in court filings to a motion for spoliation sanctions ensured the Court and opposing counsel were aware of his intent to file such a motion, and the only reason for a delay in its filing was the compiling of deposition transcripts and evidence in order to determine what, if any, evidence had not been preserved. Also, Goodman argues that he could not "prepare both [the spoliation motion] and the [motion for summary judgment briefs] by the [motion for summary judgment] deadline." Pl.'s Mem. Supp. 4. Further, relying on *Marrocco v. General Motors Corp.*, 966 F.2d 220, 225 (7th Cir. 1992), Goodman contends that a spoliation motion may be brought "years after the spoliation was discovered." *See* Pl.'s Reply 2–4.

Fed.R.Civ.P. 37 governs most motions for discovery sanctions, but it does not contain any specific reference to the timing of the filing of a motion seeking spoliation sanctions. *See McEachron v. Glans*, No. 98–CV–17(LEK/DRH), 1999 WL 33601543, at *2 (N.D.N.Y. June 8, 1999). Courts considering this issue have identified a number of factors that can be used to assess the timeliness of spoliation motions. First, "[k]ey to the discretionary timeliness assessment of lower courts is how long after the close of discovery the relevant spoliation motion has been made...." *See, e.g., id.* at *2 & n. 3 (holding spoliation motion made two weeks after the close of discovery was timely); *id.* at *2 (citing

---

4. In addition, Tracer/PSI argues that the filing of Goodman's Motion constitutes a violation of D. Md. Local Rule 104.7, because Goodman failed to participate in a discovery conference with Tracer/PSI to potentially resolve the dispute and file a certificate with the Court attesting to their good faith efforts. It is not clear how a motion for spoliation sanctions could have been avoided in this case had Goodman sought to meet and confer with Tracer/PSI, given the frequency and magnitude of their disagreements over the instant issue.

*Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 886 (S.D.N.Y.1999) (finding motion for spoliation sanctions filed two months after conclusion of discovery was timely, as it was "not brought well after the close of discovery ... nor after the start of trial")). Second, a court should examine the temporal proximity between a spoliation motion and motions for summary judgment. *See, e.g., id.* (citing *Glenn v. Scott Paper Co.*, Civ. A. No. 92–1873, 1993 WL 431161, at *17 n. 3 (D.N.J. Oct. 20, 1993) (spoliation argument used to defend a summary judgment motion was untimely, as the plaintiff did not raise any concerns "during the discovery phase or bring them to the attention of the magistrate [judge]")); *Morse Diesel Int'l, Inc. v. United States*, 81 Fed.Cl. 220, 222 (2008) (plaintiff's spoliation motion, which was filed *after* the court ruled on the plaintiff's motion for partial summary judgment, was held to be untimely); *Ferrone v. Onorato*, No. 05–303, 2007 WL 2973684, at *10 (W.D.Pa. Oct. 9, 2007) (spoliation argument should have been made in "appropriate discovery motion," and not in "opposition to summary judgment [motion]"); *but see, e.g., McDonald v. Wal–Mart Stores East, LP*, No. 3:07cv425, 2008 WL 153783, at *1 & n. 1 (E.D.Va. Jan. 14, 2008) (granting plaintiff's request to file untimely summary judgment motion *nunc pro tunc* because spoliation argument contained in the motion was present in earlier motion *in limine*, and "[c]reating a clear record benefits both parties"). Third, courts should be wary of any spoliation motion made on the eve of trial.[5] *See, e.g., Permasteelisa CS Corp. v. Airolite Co., LLC*, No. 2:06–cv–569, 2008 WL 2491747, at *2–3 (S.D.Ohio June 18, 2008) (spoliation motion filed one week before trial was held to be untimely); *Shamis*, 34 F.Supp.2d at 886. Fourth, courts should consider whether there was any governing deadline for filing spoliation motions in the scheduling order issued pursuant to Fed.R.Civ.P. 16(b) or

---

**5.** Some courts also have examined whether the spoliation motion "was made in accordance with Rule 37." *McEachron*, 1999 WL 33601543, at *2; *accord Glenn*, 1993 WL 431161, at *17 n. 3. Neither the *McEachron* nor the *Glenn* courts provide an explanation as to the meaning of this phrase; however, it stands to reason that a court should take Rule 37 compliance into consideration when dealing with a spoliation motion founded on a violation of a specific court order, rather than a motion brought under the court's inherent power to control the judicial process. Because *Goodman* does not contend that Tracer/PSI's spoliation violated an order of this Court, compliance with Rule 37 is irrelevant to determining whether Goodman's Motion was timely. For these reasons, I am not persuaded by Tracer/PSI's citation of *Media Communications, Inc.* In that case, the defendant counter-sued the plaintiff for allegedly failing to make payments after the defendant built and installed an LED display sign for the plaintiff. 1999 WL 1212652, at *1. The plaintiff moved for dismissal of the defendant's counterclaim, arguing that the defendant removed a chip from the sign's computer while the sign was still in the plaintiff's possession, and subsequently repossessed and sold the sign. *Id.* at *3. The court noted that in April 1999 the plaintiff obtained a protective order to have the defendant preserve and maintain the sign, and the repossession appeared to have occurred in July 1999. *Id.* Despite the defendant's purported violation of a protective order, the plaintiff did not seek sanctions for the repossession until late November. *Id.* at *4. Further, the plaintiff failed to respond to the defendant's motion to extinguish the protective order; therefore, the court questioned whether the protective order was still in effect. *Id.* at *3–4. In comparison, the present case is distinguishable from *Media Communications, Inc.*, as Goodman did not wait months after the issuance and violation of a *court order* to bring a spoliation motion. The Court also fails to see the relevance of Goodman's reference to *Marrocco*, as that court failed to provide any explanation as to why a motion for violation of a protective order, filed nearly four years after the destruction of evidence, was timely. *See* 966 F.2d at 222–23.

by local rule. Finally, the explanation of the moving party as to why the motion was not filed earlier should be considered.

The lesson to be learned from the cases that have sought to define when a spoliation motion should be filed in order to be timely is that there is a particular need for these motions to be filed as soon as reasonably possible after discovery of the facts that underlie the motion. This is because resolution of spoliation motions are fact intensive, requiring the court to assess when the duty to preserve commenced, whether the party accused of spoliation properly complied with its preservation duty, the degree of culpability involved, the relevance of the lost evidence to the case, and the concomitant prejudice to the party that was deprived of access to the evidence because it was not preserved. *See, e.g., Silvestri*, 271 F.3d at 594–95. Before ruling on a spoliation motion, a court may have to hold a hearing, and if spoliation is found, consideration of an appropriate remedy can involve determinations that may end the litigation or severely alter its course by striking pleadings, precluding proof of facts, foreclosing claims or defenses, or even granting a default judgment. And, in deciding a spoliation motion, the court may order that additional discovery take place either to develop facts needed to rule on the motion or to afford the party deprived of relevant evidence an additional opportunity to develop it from other sources. The least disruptive time to undertake this is *during* the discovery phase, not after it has closed. Reopening discovery, even if for a limited purpose, months after it has closed or after dispositive motions have been filed, or worse still, on the eve of trial, can completely disrupt the pretrial schedule, involve significant cost, and burden the court and parties. Courts are justifiably unsympathetic to litigants who, because of inattention, neglect, or purposeful delay aimed at achieving an unwarranted tactical advantage, attempt to reargue a substantive issue already ruled on by the court through the guise of a spoliation motion, or use such a motion to try to reopen or prolong discovery beyond the time allotted in the pretrial order.[6]

---

6. *See, e.g., Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07–0069, 2009 WL 790107, at *7 (M.D.Tenn. Mar. 24, 2009) (noting that reopening discovery in Fair Labor Standards Act case would "mean significant delay and cost to both parties"); *Cricket Commc'ns, Inc. v. Hipcricket, Inc.*, No. C08–00908 MJP, 2009 WL 426618, at *1 (W.D.Wash. Feb. 20, 2009) (finding that "[r]eopening discovery would disrupt the pretrial and trial schedule, increase costs to the parties, and unfairly prejudice [the plaintiff]"); *Convolve, Inc. v. Compaq Computer Corp.*, No. 00 Civ. 5141 GBDJCF, 2007 WL 415145, at *2 (S.D.N.Y. Feb. 7, 2007) ("The cost and delay involved in reopening discovery may constitute prejudice sufficient to warrant even the exclusion of otherwise critical evidence."); *Webb v. City of Joliet*, No. 03 C 4436, 2006 WL 1005365, at *3 (N.D.Ill. April 13, 2006) ("Reopening discovery, which has been closed for more than one year, would impose additional costs and burdens on the Court and the defendants that would unduly delay the resolution of this three-year-old case."); *Panaderia La Diana, Inc. v. Salt Lake City Corp.*, 342 F.Supp.2d 1013, 1031 (D.Utah 2004) ("[R]eopening discovery would come at great monetary costs to the parties who have already spent five years in litigating this case."); *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 376 (D.Md.1999) ("Delays are a particularly abhorrent feature in today's trial practice. They increase the cost of litigation, to the detriment of the parties enmeshed in it; they are one factor causing disrespect for lawyers and the judicial process; and they fuel the increasing resort to means of nonjudicial dispute resolution. Adherence to reasonable [pretrial discovery] deadlines is critical to restoring integrity in court proceedings.") (quoting *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir.1990)); *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 86 F.R.D. 694, 702 (E.D.N.C.1980) (noting the reopening of discovery would be "highly disruptive of an already tight pretrial schedule").

In this case, Goodman filed his spoliation Motion more than five months after the conclusion of discovery, and more than two months after dispositive motions had been fully briefed. He has offered no satisfactory explanation why he could not have filed his Motion much earlier, which is particularly egregious given the fact that he clearly was aware of the grounds for his Motion months before he filed it, as he noted his intention to file a spoliation motion in the August 15th Joint Status Report. Nor is the fact that Goodman is proceeding *pro se* a mitigating factor, as he has demonstrated throughout this case that, when it suits him, he has a considerable command of the procedural and substantive law, and a well-honed, frequently exercised ability to file motions and memoranda. It is difficult not to reach the conclusion, on the record before me, that Goodman was dilatory in filing his Motion for spoliation sanctions to a degree that would warrant denying it as untimely. The justification for not doing so is that the dispositive motions had not yet been ruled on when Goodman's Motion was filed, Goodman did not attempt to reargue his summary judgment motion in his spoliation Motion, it was not filed on the eve on trial, and the relief granted in this Memorandum Opinion will not entail reopening discovery or delaying the upcoming trial.

Accordingly, Tracer/PSI's request to deny Goodman's Motion as untimely is denied.

## IV. Required Elements for Spoliation Sanctions

■ A party seeking sanctions for spoliation must prove the following elements: (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*Thompson,* 219 F.R.D. at 101 (citing *Zubulake v. UBS Warburg, LLC* ("*Zubulake IV*"), 220 F.R.D. 212, 220 (S.D.N.Y.2003)).

### A. The Duty to Preserve—The Trigger Date

■ With respect to the first element, "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation."[7] *Silvestri,* 271 F.3d at 591.

---

7. In its Response, Tracer/PSI urges the Court to adopt the standard set forth in *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614 (D.Colo.2007), providing that "[w]hile a party should not be permitted to destroy potential evidence after receiving unequivocal notice of impending litigation, the duty to preserve relevant documents should require *more than a mere possibility of litigation.*" *Id.* at 621 (emphasis added) (citing *Hynix Semiconductor Inc. v. Rambus, Inc.,* 591 F.Supp.2d 1038, 1061–62 (N.D.Cal.2006) (noting that litigation must be "probable," rather than "a possibility," and the "path to litigation" must be "clear" and "immediate")); *accord Henkel Corp. v. Polyglass USA,*

*Inc.,* 194 F.R.D. 454, 456 (E.D.N.Y.2000) (finding the duty to preserve arises when litigation is " 'likely to be commenced' ") (quoting *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 73 (S.D.N.Y.1991)). This Court declines to follow the *Cache* ruling, as the law surrounding the duty to preserve is well-settled in the Fourth Circuit. *See Silvestri,* 271 F.3d at 591 (duty to preserve arises when litigation is reasonably anticipated); *see also Samsung Elecs. Co., Ltd. v. Rambus, Inc.,* 439 F.Supp.2d 524, 568 (E.D.Va.2006) ("[T]he point at which litigation becomes probable does not necessarily correspond with when a party anticipated, or reasonably should have

Whereas Goodman argues that Tracer/PSI's duty to preserve alternatively arose in April 1999, November 1999, March 2000, or December 2000, Tracer/PSI contends that the duty arose only after receiving the Goodman's February 19, 2001 letter.

The mere existence of a dispute does not necessarily mean that parties should reasonably anticipate litigation or that the duty to preserve arises. *See Treppel v. Biovail Corp.*, 233 F.R.D. 363, 371 (S.D.N.Y.2006). By April 1999, Marty had severed all ties between Goodman and the EPA, thereby arguably preventing him from obtaining the EPA exemptions and securing his success fee. Although these actions may have given rise to the dispute that underlies this litigation, Goodman and Tracer/PSI negotiated for quite some time before litigation became reasonably foreseeable. During her deposition, Marty testified to the following regarding the November 1999 emails:

> [Goodman]: So, when you said I could more comfortabl[y] live with our original agreement that was a response to my saying that we should not reduce the success fee?
>
> [Marty]: *That was if I felt like you had any role in achieving it,* and after we got together with Mary Gade and Dick Wilson ... and they said they didn't need you and you didn't bring anything to the picture th[a]n [a] different ball game.
>
> [Goodman]: Did you say that to me in this email?
>
> [Marty]: No, because I hadn't met ... Wilson ... at this point.

Tracer/PSI has characterized this exchange benignly, as merely "continuing the business relationship" between the parties. Def.'s Resp. 7. Goodman contends that it

shows Tracer/PSI would only pay him the success fee "if he participated in the final meetings with [the] EPA, which was at [Marty's] sole discretion based on whether Goodman's ongoing participation would be needed[,] but did not communicate that caveat to Goodman in any way." Pl.'s Mem. Supp. 7 (internal citations omitted). Thus, as Goodman sees it, preventing him from contacting the EPA would result in a "contract dispute from [November 1999] forward." *Id.* This argument is tenuous at best, as it presupposes that Tracer/PSI had concluded that Goodman would never earn the right to resume contact with the EPA, and that it should therefore reasonably anticipate that Goodman would file suit regardless of whether the exemptions were ultimately obtained. Similarly, the March 2000 email exchange was insufficient to put Tracer/PSI on notice that a claim by Goodman was reasonably foreseeable. Goodman's email said that he had "real questions," which is vague, and would not, when objectively viewed, put Tracer/PSI on notice of foreseeable litigation. In Goodman's email, he complained that he could be "deprived of the chance to perform under [the] contract," but this was in reference to *Wilson* failing to obtain the exemptions. Were this to happen, Goodman would still have been to able to argue that he was entitled to his success fee—if the exemptions were granted because of work that Goodman had done. Accordingly, the November 1999 email exchange was insufficient to trigger Tracer/PSI's duty to preserve evidence.

Similarly, the December 2000 phone conversation between Goodman and Marty did not trigger the duty to preserve, as Marty testified she did not recall telling Goodman that Tracer/PSI would offer him $20,000 in exchange for a release of any

anticipated, litigation."), *vacated on other grounds*, 523 F.3d 1374 (Fed.Cir.2008), *cert.*

denied, —— U.S. ——, 129 S.Ct. 279, 172 L.Ed.2d 149 (2008).

claim. *See* Def.'s Resp. 9. While Goodman states in an affidavit that Marty did say that to him, there is no contemporaneously created corroborating evidence that has been presented that would enable me to resolve this disputed fact in Goodman's favor.

I do find, however, that the duty to preserve was triggered when Goodman sent his January 5, 2001 letter to Marty, because "[p]re-filing communications between the litigants can ... provide constructive notice that litigation is likely. Demand letters stating a claim may be sufficient to trigger an obligation to preserve." Shira A. Scheindlin, Daniel J. Capra & The Sedona Conference, *Electronic Discovery and Digital Evidence: Cases and Materials* 106 (2008). Relying on *Cache*, 244 F.R.D. 614, Tracer/PSI argues that Goodman's letter constituted "a request for compensation and an attempt to negotiate a resolution," as opposed to a threat of litigation. Def.'s Resp. 9. I disagree.

In *Cache*, plaintiff's counsel contacted the defense counsel, and stated that the defendant could possibly be infringing on one of the plaintiff's trademarks for its products. In a June 5, 2000 letter written to defense counsel, plaintiff's counsel stated that the defendant was engaging in a "very active marketing campaign [which could] present a situation that [might] become a very serious problem." 244 F.R.D. at 622 (internal quotation marks omitted). Plaintiff's counsel stated that the purpose of the letter was to put the defendant on notice of the plaintiff's "trademark rights," and "determine whether this situation [could] be resolved *without litigation and media exposure*." *Id.* (emphasis added) (internal quotation marks and citations omitted). In a subsequent letter, plaintiff's counsel did not threaten litigation, and stated that he was "willing to listen to

what [the defendant] might propose" to resolve the matter. *Id.* (citations and internal quotation marks omitted). The *Cache* court held that the letters did not trigger the duty to preserve, as they did not "threaten" litigation, and the plaintiff seemed amenable to reaching a non-litigious solution. *See id.* In the present case, Goodman's January 5, 2001 letter to Marty noted that he had consulted two attorneys regarding the matter, and advised Marty that if he was "forced to litigate," then he could potentially receive damages in excess of the disputed amount from the contract. This language distinguishes Goodman's letter from the more conciliatory letters in *Cache*. It may be that a letter that merely identifies a dispute but expresses an invitation to discuss it or otherwise negotiate does not trigger the duty to preserve evidence, but where, as here, the letter openly threatens litigation, then the recipient is on notice that litigation is reasonably foreseeable and the duty to preserve evidence relevant to that dispute is triggered. I therefore find that Tracer/PSI's duty to preserve evidence relevant to the claim raised in this case commenced with Goodman's January 5, 2001 letter.

**B. The Duty to Preserve—The Key Players to the Litigation**

█ Once a party reasonably anticipates litigation, it is obligated to suspend its routine document retention/destruction policy and implement a "litigation hold" to ensure the preservation of relevant documents. *Thompson*, 219 F.R.D. at 100 (quoting *Zubulake IV*, 220 F.R.D. at 218). "Relevant documents" includes the following:

> [A]ny documents or tangible things (as defined by [Fed.R.Civ.P. 34(a))] made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or

defenses." The duty also includes documents prepared *for* those individuals, to the extent those documents can be readily identified (*e.g.*, from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action." Thus, the duty to preserve extends to those employees likely to have relevant information—the "key players" in the case.

*Zubulake IV*, 220 F.R.D. at 217–18 (footnotes omitted). Thus, as of January 5, 2001, Tracer/PSI was obligated to implement a litigation hold with respect to relevant documents including electronically stored information for the "key players" involved with the dispute with Goodman. Tracer/PSI argues that Marty was the only "key player" to this litigation, as "[s]he executed the contract with Goodman and was considered by everyone to be Goodman's primary contact." Def.'s Resp. 11 (citing *Zubulake IV*, 220 F.R.D. at 218).

As viewed by Tracer/PSI, "the vast majority of communications occurred between Marty and Goodman," therefore, Marty was the only individual at Tracer under an obligation "to preserve documents relevant to Goodman's claims." *Id.* Tracer/PSI's argument is founded on a misreading of *Zubulake IV*; identifying a "key player" in litigation is not dependent on the volume of interaction between an individual and a litigant, but rather is determined by whether an individual is likely to have information relevant to the events that underlie the litigation. Goodman contends that the duty to preserve extended beyond Marty, and also was applicable to: (1) Wilson and Gade, third-party consultants for Tracer; (2) Golding, the Tracer employee responsible for answering technical questions on the project; and (3) Thompson, Tracer's founder. *See* Pl.'s Mem. Supp. 9–10, 17. For reasons discussed below, I find that the duty to preserve applied to Marty, Golding, and Thompson, but not to Wilson or Gade.[8]

---

8. In Goodman's Reply Memorandum, he asserts for the first time that the duty to preserve applied to Himmelstein, the NES consultant, Jim Bailey, Tracer's Vice–President of Sales and Marketing, and Tracer employees Karl Overmann and Pat Mumme. Goodman claims these employees were responsible for drafting "regulatory references and manuals," and contacted Goodman to inform him of "status [sic] and logistics." Pl.'s Reply 11. If this were true, then "[t]heir communications with the outside regulatory contacts, clients, etc.[,] would clearly be discoverable and likely relevant to this central issue." *Id.* Goodman also states "at least five Tracer staff commented on ... Goodman's draft petition and his paper on Tracer's environmental role," yet he does not identify these individuals, nor does he explain how any of the drafts would provide information relevant to his claims. *See id.* at 12. Aside from Goodman's failure to identify the five Tracer employees, his attempt to expand the list of Tracer's key players fails for a more fundamental reason— it may not be considered by the Court because it was first raised in Goodman's Reply Memo-

randum. Courts have broad discretion to decline to consider arguments or issues first raised in a reply brief. *See, e.g., Rasmussen v. Cal. DMV*, No. CV 08–1604–FMC (PLA), 2008 WL 5274611, at *2 n. 2 (C.D.Cal. Dec. 17, 2008) (refusing to consider argument first raised in defendants' reply because the plaintiff was not given a chance to respond) (citing *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir.2001); *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1514 n. 6 (9th Cir.1994); *Daghlian v. DeVry Univ., Inc.*, 461 F.Supp.2d 1121, 1144 n. 37 (C.D.Cal.2006)); *Nielsen v. U.S. Bureau of Land Mgmt.*, 252 F.R.D. 499, 528 n. 15 (D.Minn.2008) (noting "argument was improperly brought up by plaintiff for the first time in [a] reply, thus preventing defendants from having any opportunity to respond to it"); *Kavalir v. Medtronic, Inc.*, No. 07 cv 0835, 2008 WL 4087950, at *3 n. 4 (N.D.Ill. Aug. 27, 2008) ("[T]he Court will not entertain new legal arguments made for the first time in a reply brief to which Plaintiff had no opportunity to respond."); *Puckett v. McPhillips Shinbaum*, No. 2:06cv1148–ID, 2008 WL 906569, at *24

■ Whether Tracer/PSI had an obligation to preserve documents prepared by Wilson that were relevant to this dispute is a critical question. During his deposition testimony, Wilson spoke of an active file he kept while working on the project to exempt the tracers from the EPA regulations:

[Goodman]: Did you keep a hard copy file on the tracers project while you were working on it?

[Wilson]: I presumably did. My practice would be to have a working file with notes and documents and stuff like—

[Goodman]: Do you know what happened to the file?

[Wilson]: I don't. I assume we disposed of it, you know, after a while, after the issue was resolved, eight years ago or whatever.

[Goodman]: How long after the project do you normally keep files?

[Wilson]: Whenever I get my drawers filled up and start—take the time to dispose of old stuff that I don't need anymore. No particular practice.

[Goodman]: But is there any period of time during which you would refrain from disposing of it?

[Wilson]: No, not particular, no on, you know, an issue like this which—you know, some clients we have, we have sort of a continuing series of issues resolving, but this was a particular issue that we worked on and got resolved, so there was no particular reason to save the file.

[Goodman]: So, you don't have any idea how long you might have had the file?

[Wilson]: I have no idea.

[Goodman]: *Would your file have included your own notes relating to the project?*

[Wilson]: *Presumably, sure.*

[Goodman]: *Would you have better knowledge of the facts I have asked about if you had access to that file?*

[Wilson]: *Of course.*

Wilson Dep. 95:13–97:2 (emphasis added). Because Tracer/PSI contends that Wilson and Gade were solely responsible for obtaining the exemptions, Wilson's file clearly would contain highly relevant information:

[Def.'s counsel]: Okay. All right. Did Mr. Goodman's work play any part in your obtaining relief for Tracer from the EPA?

[Wilson]: I can't answer that. *Without my file, I have no recollection one way or another as to the use we made of Mr. Goodman's work.* I don't know to what extent we had been provided it.

[Def.'s counsel]: Did you consider Mr. Goodman's work a key to your success with the EPA?

[Wilson]: I don't recall.

[Def.'s counsel]: Do you believe that Mr. Goodman crafted the strategy that you had with the EPA?

[Wilson]: Again, I don't recall. Obviously we feel like we created the strategy ourselves, but obviously we relied on a lot of resource material that was provided [to] us by Tracer. *And without my file, I don't know how much or what parts of that Mr. Goodman provided.*

*Id.* at 115:21–116:16 (emphasis added). The parties vehemently disagree over the exact nature of the business relationship between Tracer/PSI and Wilson. Good-

n. 16 (M.D.Ala. Mar. 31, 2008) (declining to address two additional grounds for summary

judgment raised for the first time in defendants' reply brief).

man claims NES, Wilson's employer, was an "agent" of Tracer, and that any electronically stored information ("ESI") or materials in its possession "[were] owned by Tracer." Pl.'s Reply 12; *accord id.* at 13 ("Tracer had access to the NES evidence but Goodman did not, because Tracer essentially owned the rights to it.") (emphasis added). Tracer/PSI argues that Wilson was "an independent third-party contractor" who was beyond its control, and that it was under no obligation to ensure preservation of evidence on his behalf. *See* Def.'s Resp. 22. In *Silvestri*, the Fourth Circuit extensively discussed the doctrine of spoliation of evidence, and paid particular attention to what a party must do to fulfill its duty to preserve relevant evidence. The court stated, relevantly, "If a party cannot fulfill [the] duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence." *Silvestri*, 271 F.3d at 591 (emphasis added). Tracer/PSI argues that if Goodman already knew that Wilson was involved in the project, then it was under no obligation to provide Goodman with any notification that Wilson possessed relevant evidence regarding Goodman's claim against Tracer/PSI. Def.'s Resp. 22–23 ("Nothing prevented Goodman from contacting Wilson at some point over the eight-year period and demanding that Wilson preserve documents or issuing a subpoena to Wilson for such documents. Indeed, once litigation began, Goodman did contact Wilson.").

What is meant by "control," as used by *Silvestri* in the context of a spoliation claim, has yet to be fully defined. In

*Silvestri*, a plaintiff suffered injuries after the airbags in his vehicle purportedly failed to deploy following an accident. 271 F.3d at 586. Before filing suit against defendant General Motors, the plaintiff permitted the vehicle to be repaired and sold without giving the defendant the opportunity to perform an inspection. *Id.* at 587. The district court then granted summary judgment in favor of the defendant based on spoliation of evidence. *Id.* at 589. On appeal, the plaintiff argued that "he had no duty to preserve the vehicle because he was not its owner and because neither he nor his [attorneys and retained experts] were in any way engaged in the destruction of the evidence." *Id.* at 591. The Fourth Circuit recognized that the plaintiff did not "own the vehicle, nor did he even control it in a legal sense after the accident because the vehicle belonged to his landlady's husband." *Id.* But it was apparent that the plaintiff had "*access* to the vehicle, as his attorney … and his retained experts were given apparently unlimited access to the vehicle for inspection purposes." *Id.* (emphasis added). Moreover, the plaintiff, his attorneys, and his expert witnesses all anticipated filing suit against the defendant, and were "fully aware that the vehicle was material evidence in that litigation."[9] *Id.* at 592. Thus, the Fourth Circuit agreed with the district court that the plaintiff failed to preserve material evidence in anticipation of litigation or to "notify [the defendant] of the availability of [the] evidence." *Id.*

■ However, when considering Tracer/PSI's authority, vel non, over Wilson, helpful guidance is provided in the case of *In re NTL, Inc. Securities Litigation*, in

9. *See also In re WRT Energy Secs. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y.2007) (noting plaintiffs in securities fraud litigation had "functional control" over relevant documents because "they were advised that the documents would be destroyed and were given the opportunity to take custody of them").

which the court discussed the meaning of "control" in the context of a party's obligation to respond to a Rule 34 request for production of documents. In that case, class-plaintiffs filed suit against a company known as NTL, Inc. ("NTL"), for federal securities laws violations. 244 F.R.D. at 181. NTL then entered into Chapter 11 bankruptcy, and two separate companies subsequently emerged: NTL Europe, Inc. ("NTL Europe"), and NTL, Inc. ("New NTL"). *Id.* NTL's bankruptcy plan permitted the plaintiffs' securities lawsuits to go forward against any individual defendants and NTL Europe as the successor to NTL. *Id.* Although NTL had purportedly sent out litigation hold memoranda to its various key players, these notices were largely ignored. NTL Europe contended it could not be responsible for any spoliation because it did not have "control" over documents or ESI relevant to any of the plaintiffs' requests for production of documents; rather, any material was in non-party New NTL's possession. *Id.* at 194–95. The court stated that "[u]nder Rule 34(a), parties may request from their adversaries documents (including ESI) 'which are in the possession, custody, or control of the party upon whom the request is served.'" *Id.* at 195 (quoting Fed.R.Civ.P. 34(a)). Rule 34 "control" would not require a party to have legal ownership or actual physical possession of any documents at issue. Instead, documents are considered to be under a party's control when that party has "'the right, authority, or practical ability to obtain the documents from a non-party to the action.'" *Id.* (quoting *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.,* 171

F.R.D. 135, 146–47 (S.D.N.Y.1997)). The court found that NTL Europe had both the legal right and the practical ability to obtain any documents in New NTL's possession, as a "document sharing clause" made it "clear that New NTL was to make available to ... NTL Europe any documents that it needed to be able to comply with its legal obligations, such as [the plaintiffs' suit]." *Id.* at 195–96. Second, NTL Europe's practical ability to obtain the documents was evidenced by testimony from NTL Europe's CEO, who stated that "[w]henever there was a document that we needed [from New NTL] ..., we would call [New NTL] and ask if they had it, and if they had it, they'd send it." *Id.* at 196. As such, New NTL had the necessary "control" over documents to be able to preserve and produce them in litigation. *Id.* at 195.

The concept of control as interpreted by *In re NTL, Inc. Securities Litigation* in the context of Rule 34 provides the closest analogy to control in connection with a spoliation issue, and applying it to this dispute, I conclude that Tracer/PSI did not have the sufficient legal authority or practical ability to ensure the preservation of documents prepared by Wilson. Apart from Goodman's conclusory statements, no evidence has been presented to demonstrate that Tracer/PSI had any legal control over documents prepared or maintained by Wilson.[10] Further, Goodman has failed to show the existence of facts that would demonstrate a relationship between Tracer/PSI and Wilson comparable to the cooperative, file-sharing relationship between NTL Europe and New NTL from

---

10. Tracer/PSI originally filed a copy of the "contract" with NES as an attachment to an exhibit in its Motion for Partial Summary Judgment, Ex. 1, Attach. A. In actuality, the contract is a January 13, 2000 letter from Himmelstein to Marty, accepting Tracer's of-

fer to act as representatives throughout the duration of the project. The contract is silent as to whether Tracer/PSI would have possessory rights, access to, or control of any documents prepared and maintained by NES.

*In re NTL, Inc. Securities Litigation.*[11] Goodman also fails to identify any evidence that would support a conclusion that Tracer/PSI's duty to preserve extended to Gade; therefore, I conclude that, on the record before me, Tracer/PSI had no obligation to preserve any documents prepared by Wilson and Gade.

I do find that the duty to preserve applied to Marty, Golding, and Thompson, over whom Tracer/PSI undisputedly exercised control. First, Tracer/PSI acknowledges that Marty had an obligation to preserve relevant evidence. *See* Def.'s Resp. 11. Second, although their involvement in the project was somewhat limited, Thompson did have contact with Goodman when he started working on the project, and if Golding was responsible for answering technical questions for various individuals throughout the duration of the project, it could be relevant to know which individuals Golding had been contacting and what specific information he was providing.

With exception to any materials prepared by Wilson or Gade, Tracer/PSI had

---

**11.** In *Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc.*, 237 F.R.D. 561 (D.Md.2006), this Court adopted, by reference, the "practical ability" test when determining the scope of a party's obligation to produce documents in response to a Rule 34 request. *Id.* at 564 ("Control has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought on demand.") (citations and internal quotation marks omitted). However, not all courts have accepted this test, *see Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.1993) ("[T]he fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean that the document is in its possession, custody, or control; in fact, it means the opposite."); *Bleecker v. Standard Fire Ins. Co.*, 130 F.Supp.2d 726, 739 (E.D.N.C.2000) ("Adopting the 'ability to obtain' test would usurp [the principles of Rule 34], allowing parties to obtain documents from non-parties who were in no way controlled by either party."), and the contours of the practical ability test are still evolving. *See, e.g., In re Rudolfo Lozano*, 392 B.R. 48, 55–56 (Bankr. S.D.N.Y.2008) (holding there is a practical ability to obtain documents "if the assignee of the original mortgagee, or the current loan servicer, can by custom or practice in the mortgage business informally request and obtain the original loan file, and any related documents, including a payment history"); *Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D.Kan.2007) (finding a practical ability present when the defendants could "simply ask" or "employ their 'right or ability to influence'" so as to gain documents); *Bank of N.Y.*, 171 F.R.D. at 149 (holding there was a practical ability by defendant to obtain documents from third-party because "[the defendant] ha[d] been able to obtain documents from [the third-party] when it ha[d] requested them," and the third-party readily cooperated with the defendant's requests by searching for and turning over relevant documents from its files); *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138–39 (2d Cir.2007) (suggesting a practical ability to obtain documents if a party "has access to them and can produce them") (citing *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 530 (S.D.N.Y.1996) (citations omitted)); *Synopsys, Inc. v. Ricoh Co.*, No. C–03–2289 MJJ (EMC), 2006 WL 1867529, at *2 (N.D.Cal. July 5, 2006) (finding defendant had practical ability to obtain documents because third-party agreed to be represented by defense counsel for purposes of discovery, and that the defendant was able to secure a search for documents in the third-party's facility within three days); *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y.1992) (holding there was a practical ability of plaintiff to obtain documents from third-party, because sub-license agreement provided the plaintiff the "right to cooperation" by the third-party, and that prior history of the case suggested such cooperation encompassed "production of documents and other assistance in conducting discovery"). While the practical ability test may be useful in assessing a party's obligations under Rule 34, the "control" test articulated by the *In re NTL, Inc. Securities Litigation* court appears to be more useful in determining the control required under *Silvestri* to trigger a party's duty to preserve evidence.

an obligation to preserve any relevant evidence from the key players that Goodman could have used to support his claim. After January 5, 2001, Tracer/PSI should have issued a litigation hold to the key players to ensure compliance with the duty to preserve. This was not done. As a result, Golding's computer, Thompson's computer, and Marty's laptop eventually were discarded in violation of the duty to preserve. Additionally, Tracer/PSI's failure to issue a litigation hold prevents the Court from determining the exact number of relevant emails, memoranda, or documents from the key players that were not preserved.[12] Goodman also argues that

**12.** In an attempt to underplay its violation of the duty to preserve, Tracer/PSI alleges that the "the dispute at issue involved a relative small universe of documents" and "there was no need for any company-wide formal litigation hold to preserve the evidence—because Marty preserved the evidence herself" by printing and saving "relevant" emails. *See* Def.'s Resp. 17. For example, Tracer/PSI theorizes that very few relevant documents would exist because Tracer/PSI had already searched a retained server and only found "one responsive document," and nearly 2,530 pages of documents had already been produced to Goodman during the discovery phase. *Id.* at 17–18. This is wholly incorrect, as Tracer/PSI fails to recognize that the search results of the lone server, Marty's selective email printing process, or the previously produced documents could not encompass the entire universe of relevant documents that *should* have been preserved. The argument of an accused spoliator that it did not violate its duty to preserve evidence because it retained the "relevant" information and only deleted "irrelevant" information rings particularly hollow. The ultimate decision of what is relevant is not determined by a party's subjective assessment filtered through its own perception of self-interest. In Tracer/PSI's Response, it also states the following:

> [I]t is relevant that Tracer was a small "mom and pop" company that did not have sophisticated information systems like those that may exist in companies today.... Moreover, e-Discovery protocols that exist routinely in companies today had yet to be developed. In fact, *Zubulake*, the leading case on this issue, was not decided until 2002 and 2003. In addition, the rules pertaining to electronically stored information were not incorporated into the Federal Rules of Civil Procedure until 2006.

*Id.* at 25–26. As evidenced by this colloquy, Tracer/PSI ignores the fact that the "imposition of sanctions for spoliation has deep historic roots." *Pastorello v. City of New York*, No. 95 Civ. 470(CSH), 2003 WL 1740606, at *7 (S.D.N.Y. April 1, 2003); *see also id.* (" 'The law, in hatred of the spoliator, baffles the destroyer, and thwarts his iniquitous purpose, by indulging a presumption which supplies the lost proof, and thus defeats the wrongdoer by the very means he had so confidentially employed to perpetrate the wrongdoing.' " (quoting *Pomeroy v. Benton*, 77 Mo. 64, 86 (1882)). Indeed, the origin of the doctrine of spoliation is often traced back to the 288–year–old case of *Armory v. Delamirie*, 93 Eng. Rep. 664 (K.B.1722). *See, e.g., Sullivan v. Gen. Motors Corp.*, 772 F.Supp. 358, 360 n. 3 (N.D.Ohio 1991) ("At least two federal courts have traced the origins of [the spoliation doctrine] to *Armory v. Delamirie* ....") (citing *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir.1988); *Nation–Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir.1982)); Stefan Rubin, *Tort Reform: A Call for Florida to Scale Back its Independent Tort for the Spoliation of Evidence*, 51 Fla. L.Rev. 345, 346 (1999) ("Perhaps the earliest recorded decision to recognize and reprimand the spoliation of evidence was the eighteenth century decision in *Armory v. Delamirie*."); Lawrence B. Solum & Stephen J. Marzen, *Truth and Uncertainty: Legal Control of the Destruction of Evidence*, 36 Emory L.J. 1085, 1087 & n. 4 (1987) (noting that an unfavorable inference for spoliation of evidence is of "ancient lineage") (citing *Armory*, 93 Eng. Rep. 664) (citations omitted)). In *Armory*, a Dickensian tale of avarice and trickery, a chimney sweeper's boy discovered a jewel and carried it to a goldsmith's shop. 93 Eng. Rep. at 664. The goldsmith handed the jewel to his apprentice, "who under pretence of weighing it," removed the stones, and then informed the goldsmith that the jewel came to "three halfpence." *Id.* The goldsmith offered the boy the money, but he refused, and demanded to

Tracer/PSI destroyed the draft release referenced by Marty during the December 2000 telephone conversation, and that Tracer/PSI's failure to perform a keyword search on the 280 disaster recovery tapes and compact discs constitutes spoliation. First, based on the record before me, there is insufficient evidence to conclude that the draft release even existed, therefore, I cannot find that it was destroyed in violation of the duty to preserve. Second, I agree with Tracer/PSI that Goodman has failed to point to any authority that would suggest a failure to do a keyword search on backup tapes that Tracer/PSI in fact preserved is the functional equivalent of spoliation.[13]

### C. Culpability

As for the second element, there are three possible states of mind that can satisfy the culpability requirement: bad faith/knowing destruction, gross negli-

gence, and ordinary negligence. *Thompson*, 219 F.R.D. at 101 (citing *Residential Funding v. Degeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir.2002)). The degree of fault impacts the severity of the sanction, and the Fourth Circuit has established guidelines to determine when the harshest of sanctions, such as summary judgment or default judgment, should be implemented. *See Sampson*, 251 F.R.D. at 179. In Goodman's Motion, he argues that Tracer/PSI's destruction of evidence, following the failure to issue a litigation hold to key players, was done in bad faith; therefore, Goodman requests that the Court grant summary judgment in his favor. Pl.'s Mem. Supp. 24–25. Generally, dismissal is justified "in circumstances of bad faith or other 'like action,'" *Silvestri*, 271 F.3d at 593 (quoting *Cole v. Keller Industries, Inc.*, 132 F.3d 1044, 1047 (4th Cir.1998)), and courts should impose sanctions that

---

have the jewel returned to him. *Id.* The apprentice deceitfully handed the boy "back the socket without the stones," and the boy subsequently brought forth a common law claim of trover against the goldsmith. *Id.* At trial, "the Chief Justice directed the jury, that unless the [goldsmith] did produce the jewel, and shew it not to be of the finest water, they should *presume the strongest against him,* and make the value of the best jewels the measure of their damages: which they accordingly did." *Id.* (emphasis added). This could not be a clearer example of an adverse jury instruction for the spoliation of evidence. Following *Armory* and preceding *Zubulake IV*, courts continually applied the spoliation doctrine to address possible injustices after relevant evidence had been destroyed. *See, e.g., Silvestri,* 271 F.3d at 593–95; *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995). The record before me shows that Tracer/PSI retained counsel after receiving Goodman's February 19, 2001 letter. As noted, there was abundant precedent at that time to clearly identify the existence and scope of Tracer/PSI's preservation duties.

13. Goodman's argument highlights an important difference between the duty to *preserve*

and the duty to *produce.* Fed.R.Civ.P. 26(b)(2)(B) provides the following:

A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.

In accordance with the duty to preserve, Tracer/PSI retained 280 disaster recovery tapes and compact discs. If Goodman sought to have a key word search performed on the backup tapes, then he should have filed a motion to compel to search the backup tapes during discovery, rather than arguing that the "data ceasing to be reasonably accessible constitutes spoliation." *See* Pl.'s Mem. Supp. 15; *see contra Treppel v. Biovail Corp.,* 249 F.R.D. 111, 117 (S.D.N.Y.2008) (plaintiff moved to compel defendant to search specific backup tapes, but court refused, noting that plaintiff had failed to show that the effort would not be "duplicative of discovery already conducted"); *AAB Joint Venture v. United States,* 75 Fed.Cl. 432, 443 (2007) (plaintiff moved to compel discovery of backup tapes).

dispose of a case only in the most egregious circumstances:

> [T]o justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, *or* (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

*Sampson*, 251 F.R.D. at 180 (emphasis added) (quoting *Silvestri*, 271 F.3d at 593). In *Silvestri*, the appellate court concluded that the alterations to the plaintiff's vehicle were tantamount to destroying the "sole piece of evidence" in the case. 271 F.3d at 585. Based on the "deliberate or negligent" actions of the plaintiff, the defendant was denied "access to the only evidence from which it could develop its defenses adequately." *Id.* at 594. Accordingly, without addressing the egregious conduct of the plaintiff, the appellate court ruled that the defendant had suffered "irreparable prejudice," and upheld the district court's granting of summary judgment in favor of the defendant. *Id.* at 594–95. Goodman states that the "destruction or discarding of the computers ... is equivalent to the destruction of the automobile in *Silvestri*," yet the validity of this comparison is belied by Goodman failing to articulate how Tracer/PSI's destruction of evidence has substantially denied Goodman the ability to prosecute his claim.[14] Accordingly, I find that Goodman has failed to demonstrate that Tracer/PSI acted in bad faith in its destruction of evidence, and Goodman's request for summary judgment as a spoliation sanction is meritless.

Goodman also has requested that the court issue an adverse jury instruction, or a series of fact-specific adverse jury instructions, at trial. *See* Pl.'s Mem. Supp. 25–28. In *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, the appellate court noted that a showing of bad faith is not a prerequisite to obtaining an adverse jury instruction, and a court must only find that the spoliator acted willfully in the destruction of evidence:[15]

---

**14.** In addition to *Silvestri*, Goodman argues the Court should draw parallels between the instant case and *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506. *See* Pl.'s Mem. Supp. 24 ("The destruction of the computers ... is comparable to the spoliation through lack of litigation hold in *Broccoli* (which resulted in adverse judgment)...."). This argument fails for two reasons. First, the facts of *Broccoli* are clearly distinguishable from the instant case. In *Broccoli*, a plaintiff alleged that an agent of the defendant company had sexually harassed him, then orchestrated his termination after he rebuffed her advances. 229 F.R.D. at 509. Once the duty to preserve arose, the defendant "never issued a company-wide instruction regarding the suspension of any data destruction policy," and failed to produce the plaintiff's performance evaluations, corporate records supporting the defendant's assertion that the plaintiff's termination was part of a staff reduction, company officials' correspondence regarding the termination, and emails exchanged during the plaintiff's employment and following termination. *Id.* at 512. In sum, the court found the defendant had "clearly acted in bad faith," as there was "overwhelming" evidence of "a regular policy at [the defendant company] of 'deep-sixing' nettlesome documents and records." *Id.* at 511–12. Although Tracer/PSI also failed to issue company-wide litigation hold, it did not engage in the wholesale destruction of relevant documents. Thus, the level of culpability exhibited by Tracer/PSI cannot be likened to the *Broccoli* defendant's bad faith actions. Second, contrary to Goodman's assertion, Judge Davis only "included an adverse spoliation of evidence instruction in the jury instructions," as opposed to dismissing the case. *See id.* at 512.

**15.** In *Thompson*, this Court relied on the three-factor test from *Zubulake IV* as the standard for determining when a court should

[T]he trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence. While a finding of bad faith suffices to permit such an inference, *it is not always necessary....* An adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party *knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.*

*Id.* at 156 (emphasis added) (citations omitted). In *Vodusek*, the court found that the conduct of a plaintiff's expert in " 'employ[ing] destructive methods which rendered many portions of the boat [at issue in the products liability case] useless for examination by the defendants and their experts' " was willful and required an adverse inference because the expert " 'ignored the possibility that others might have entertained different theories to which the destroyed portions might have been relevant.' " *Sampson*, 251 F.R.D. at 181 (quoting *Vodusek*, 71 F.3d at 155–57). After *Vodusek*, one court noted that when

assessing the willfulness of conduct, it was imperative to recognize that spoliation, "though not conducted in bad faith, could yet be 'intentional,' 'willful,' or 'deliberate.' " *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir.2008). In *Powell v. Town of Sharpsburg*, 591 F.Supp.2d 814, 820 (E.D.N.C.2008), the court drew upon this distinction, and stated that "[d]estruction is willful when it is deliberate or intentional," whereas "bad faith" was deemed to "mean destruction for the purpose of depriving the adversary of the evidence."

Tracer/PSI argues that "[e]ven if Goodman ha[s] met his initial burden of showing that the duty to preserve had been violated, there is no evidence of bad faith ... to meet the second requirement." Def.'s Resp. 23–24. In support of this argument, Tracer/PSI contends that the facts of the instant case are analogous to *Sampson v. City of Cambridge*, 251 F.R.D. 172, and *Pandora Jewelry LLC v. Chamilia, LLC*, 2008 WL 4533902, and that there is no evidence of purposeful destruction. Def.'s Resp. 24–25. If this were true, and Tracer/PSI only negligently destroyed evidence, then an adverse jury instruction would be an improper remedy. *See Sampson*, 251 F.R.D. at 181 ("If a spoliator's conduct is merely negligent ... the ad-

grant a party's request for an adverse jury instruction upon a finding of spoliation of evidence. *See Thompson*, 219 F.R.D. at 101 (citing *Zubulake IV*, 220 F.R.D. at 220). The *Zubulake IV* test has perennially been cited by other courts when considering spoliation sanctions, *Zubulake IV*, 220 F.R.D. at 220, *cited in Eli Lilly & Co. v. Air Express Int'l USA, Inc.*, 602 F.Supp.2d 1260, 1280 (S.D.Fla.2009); *ACORN v. County of Nassau*, No. CV 05–2301(JFB)(WDW), 2009 WL 605859, at *2 (E.D.N.Y. March 9, 2009); *Pandora Jewelry, LLC v. Chamilia, LLC*, Civil No. CCB–06–3041, 2008 WL 4533902, at *8 (D.Md. Sept. 30, 2008); *Sampson*, 251 F.R.D. at 179; *Treppel*, 249 F.R.D. at 120; *Babaev v. Grossman*, No. CV03–5076 (DLI)(WDW), 2008 WL4185703, at *2 (E.D.N.Y. Sept. 8,

2008); *Toussie v. County of Suffolk*, No. CV 01–6716(JS)(ARL), 2007 WL4565160, at *6 (E.D.N.Y. Dec. 21, 2007); *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. at 192 & n. 14; *Posely v. Eckerd Corp.*, 433 F.Supp.2d 1287, 1315 (S.D.Fla.2006), and provides the framework for the discussion of law and facts in this Memorandum Opinion. In *Sampson*, Judge Gesner correctly noted that, in the Fourth Circuit, the *Vodusek* standard detailing the requirements for an adverse jury instruction remains applicable. 251 F.R.D. at 181 (citing *Vodusek*, 71 F.3d at 156). While *Zubulake IV* remains insightful, to the extent it could be read to limit the availability of sanctions, *Vodusek* must ultimately prevail in the Fourth Circuit.

verse inference instruction is not an appropriate sanction.") (citing *Hodge v. Wal–Mart Stores, Inc.*, 360 F.3d 446, 450–51 (4th Cir.2004)).

*Sampson* involved a plaintiff asserting a claim under Title VII of the Civil Rights Act of 1964, and alleging race discrimination and discrimination under the Americans with Disabilities Act based on defendant City of Cambridge's failure to promote her to the position of Assistant Director of the Department of Public Works ("DPW"), and for retaliatory action. 251 F.R.D. at 175. The plaintiff further alleged that the former Director of the DPW exhibited a discriminatory animus against her on the basis of her race and medical condition, which affected his decision not to promote her. *Id.* The plaintiff asked the defendant to search DPW employees' computer hard drives for relevant evidence; however, no emails were found on the hard drive of the former Director's computer. *Id.* at 175–76. Consequently, the plaintiff filed a motion for spoliation sanctions. *Id.* at 177–78.

The court stated that the "plaintiff did not present any evidence that would suggest that [the former Director] or anyone on behalf of defendant purposefully destroyed any documents on the hard drive." *Id.* at 182. Further, there was no "evidence of a wiping utility being used or downloaded on to [the former Director's] hard drive at any time or evidence that [a] program was used to delete or overwrite files." *Id.* Thus, the plaintiff was unable to present any direct evidence that any of the defendant's employees "intentionally or willfully deleted [the former Director's] emails." *Id.*

While Judge Gesner noted that the defendant's efforts to retain relevant documents were not "exemplary," she found there was no evidence of intentional destruction of evidence and an adverse jury instruction was unwarranted. *Id.*

In *Pandora*, the plaintiff filed suit against the defendant for alleged patent infringement of its jewelry design. 2008 WL 4533902, at *1. The defendant counterclaimed, accusing the plaintiff of wrongful interference with business relationships and an antitrust violation. *Id.* After granting the plaintiff's motion to bifurcate the trials and stay discovery on the defendant's counterclaims, the court granted the defendant's motion to quash a related subpoena for records. *Id.* Subsequently, the defendant sent a letter to a number of the plaintiff's customers which purportedly misrepresented the court's order granting the defendant's motion to quash. *Id.* The defendant also sent this "letter via email to a number of blind copy recipients." *Id.* After the plaintiff filed additional claims, the defendant contended it no longer possessed the emails because it "changed its electronic server twice during the litigation period or due to its email system forcing users to delete or archive emails every ninety days." *Id.* at *2.

Based on the defendant's failure to produce the list of email recipients during discovery, the plaintiff filed a motion for spoliation sanctions. *Id.* at *6. However, the court noted that the plaintiff offered no evidence, "other than [the defendant's] failure to retain the emails, that [the defendant] deliberately deleted or destroyed evidence." *Id.* at *9. Although the plaintiff could show the loss of the emails was a violation of the duty to preserve, this would not "necessitate a finding of willful or bad faith destruction." *Id.* Accordingly, the court held that that the defendant was merely "grossly negligent in its failure to preserve evidence," and because the plaintiff could not prove the relevancy of the lost evidence, an adverse jury instruction was not warranted. *Id.*

■ Turning to the instant matter, Tracer/PSI, much like the defendants in *Sampson* and *Pandora*, was clearly negligent in its initial failure to issue a litigation hold to Marty, Golding, and Thompson once the duty to preserve arose on January 5, 2001. By failing to implement a proper litigation hold, neither Marty, Golding, nor Thompson were aware that they should have preserved *all* relevant emails and documents. The infrequent use of email by Golding and Thompson has no impact on this outcome, as the duty to preserve is not dependent on the number of documents, whether in paper or ESI form, prepared by an individual. I also find that Tracer/PSI acted willfully when it *intentionally* destroyed the computers of Marty, Thompson, and Golding; however, I can only conclude that Tracer/PSI knew of the relevance of Marty's laptop, as opposed to the computers of Golding and Thompson. In a spoliation motion, "relevancy" is determined "to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Thompson*, 219 F.R.D. at 101. For example, the relevancy of the evidence in *Vodusek* was clear; the products liability action in *Vodusek* was centrally focused on the destroyed boat. It is true that the computers of Thompson and Golding were lost as a result of intentional conduct by Tracer/PSI, yet the factual record before me does not contain sufficient information to reach a threshold conclusion that Thompson and Golding ever used their computers for reasons relating to the project to obtain the EPA exemptions. Thus, there is insufficient evidence that the materials on their computers would have been relevant to Goodman's claims, and I do not find that there is a sufficient record to conclude that the failure to preserve Golding and Thompson's computers would warrant an adverse jury instruction.

■ In contrast, the relevancy of Marty's laptop is overwhelming, as Mary has stated, in the form of a signed affidavit, the following: "I *believed* that I retained *all* of the documents (emails, hard copy and electronic documents) *relevant* to the 'project' of *obtaining exemptions from the EPA for Tracer's leak tracers and Mr. Goodman's involvement in that 'project'* in the file cabinet in my office." Def.'s Resp. Ct. Order, Ex. 4 ¶ 13 (emphasis added). This is particularly troublesome. Marty had previously admitted that she mostly saved electronic documents onto her hard drive, rather than saving them to Tracer's i-drive; therefore, by failing to preserve her computer, Tracer/PSI knew that the only relevant documents and emails produced by Marty detailing Goodman's role in the project to obtain the EPA exemptions would be those she personally selected. I also find that Marty, acting on behalf of Tracer/PSI, willfully destroyed evidence that she knew to be relevant when she selectively deleted emails following Goodman's January 5, 2001 letter.[16]

---

16. A party may be held responsible for the spoliation of relevant evidence done by its agents. *See New Jersey Mfrs. Ins. Co. v. Hearth & Home Techs., Inc.*, No. 3:06–CV–2234, 2008 WL 2571227, at *7 (M.D.Pa. June 25, 2008) ("A party to a law suit, and its agents, have an affirmative responsibility to preserve relevant evidence. A [party] ... is not relieved of this responsibility merely because the [party] did not itself act in bad faith and a third party to whom [the party] entrusted the evidence was the one who discarded or lost it.") (citations omitted). Thus, agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master. *See, e.g., Nucor Corp. v. Bell*, 251 F.R.D. 191, 198–99 (D.S.C.2008) (agent's willful "alteration or destruction of relevant data" on laptop was directly attributable to defendant); *Connor v. Sun Trust Bank*, 546 F.Supp.2d 1360

The failure to preserve Marty's laptop and her emails, which was the result of willful conduct, permits "an inference that [Tracer/PSI and Marty] fear[ ] [to produce the evidence]," which "is some evidence that the [information not produced], if brought, would have exposed facts unfavorable to [Tracer/PSI and Marty]." *Vodusek*, 71 F.3d at 148 (citation and internal quotation marks omitted).

Thus, taking into account Tracer/PSI's destruction of Marty's laptop and Marty's deletion of emails, I hold that Tracer/PSI willfully destroyed evidence that it knew to be relevant. Accordingly, an adverse jury instruction against Tracer/PSI is warranted in this case as to the spoliation of Marty's evidence.[17] Goodman's request for a series of fact-specific adverse jury instructions[18] is denied, as Goodman fails to provide any authority to permit this Court to levy such a sanction against Tracer/PSI. Indeed, the specific "instructions" sought by Goodman would remove from the jury the ability to make any inferences at all and would be tantamount to instructing them to find in Goodman's favor. Spoliation sanctions "should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590 (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). To require a jury to draw the factual conclusions advanced by Goodman would be excessively punitive to Tracer/PSI, and would run in contravention to the true purposes behind the spoliation doctrine—"leveling the evidentiary playing field" and appropriately "sanctioning the improper conduct." *Id.* (quoting *Vodusek*, 71 F.3d at 156).

## V. Costs and Attorney's Fees

Goodman finally argues that the preservation and production of any relevant documents by Tracer/PSI would have "obviated the need for ... depositions." Pl.'s Mem. Supp. 29. If Tracer/PSI had "preserved and produced Marty's emails with Wilson, Goodman could have questioned Marty about them in her deposition, *possibly* obviating the need to depose Wilson." *Id.* (emphasis added). Goodman also asserts that "[a]ll such discovery costs are compensable in cases of spoliation.... [He] is a non-lawyer with no previous experience in discovery, let alone spoliation issues, and has obviously needed to rely on legal advice from counsel in such matters. His discovery costs should be reimbursed by [Tracer/PSI], along with all costs related to this motion and the spoliation issue." *Id.*

█ When ruling on a spoliation motion, courts will grant an award of costs or attorney's fees in four situations. First, courts will award legal fees in favor of the moving party as an alternative to dismissal or an adverse jury instruction. *See, e.g., Cache La Poudre Feeds, LLC*, 244 F.R.D. at 637 (requiring defendant to pay the costs associated with the plaintiff taking a deposition and filing a motion for relief after defendant "interfered with the judicial process" by wiping clean computer

---

(N.D.Ga.2008) (agent's bad faith destruction of email was attributable to defendant).

**17.** The "precise contours" of the adverse jury instruction are best reserved for determination by Judge Garbis in making the jury charge for trial. *See Chan*, 2005 WL 1925579, at *10.

**18.** Goodman's proposed fact-specific jury instructions range from *"Tracer knew that it rightfully owed Goodman the success fee but refused to pay merely because it thought it could get away with it,"* to *"Richard Wilson adopted Goodman's arguments directly for his approaches to [the] EPA."* Pl.'s Mem. Specific Inferences 4, 9.

hard drives); *Trigon Ins. Co. v. United States,* 234 F.Supp.2d 592, 593–94 (E.D.Va. 2002) (noting defendant was previously ordered to pay for the plaintiff's "expenses and fees incurred in its efforts to discern the scope, magnitude and direction of the spoliation of evidence, to participate in the recovery process, and to follow up with depositions to help prepare its own case and to meet the defense of the [defendant]"). Second, courts will grant discovery costs to the moving party if additional discovery must be performed after a finding that evidence was spoliated. *See, e.g., Zubulake IV,* 220 F.R.D. at 222 (ordering defendant to "bear [plaintiff's] costs for redeposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence and any newly discovered e-mails"). Third, in addition to a spoliation sanction, a court will award a prevailing litigant the litigant's reasonable expenses incurred in making the motion, including attorney's fees. *See* Fed. R.Civ.P. 37(a)(5)(A); *see also, e.g., Chan,* 2005 WL 1925579, at *10 ("The most appropriate sanction is . . . an adverse inference against the defendants. . . . The plaintiffs are also entitled to an award of the costs, including attorneys' fees, that they incurred in connection with this motion. . . . In this case, the plaintiffs have not demonstrated that they engaged in any discovery that they would not otherwise have conducted merely to obtain the equivalent of the destroyed evidence. They did, however, expend resources in the litigation of the instant motion, and the costs are compensable."); *Broccoli,* 229 F.R.D. at 509–10, 513 & n. 7 (ordering defendant to

pay "reasonable costs and attorneys' fees," including those for "client, third party and intra-office meetings with attorneys" and "time charged for drafting and editing the motion"). Fourth, in addition to a spoliation sanction, a court will award a prevailing litigant the reasonable costs associated with the motion *plus* any investigatory costs into the spoliator's conduct. *See, e.g., Leon v. IDX Sys. Corp.,* No. C03–1158P, 2004 WL 5571412, at *5 (W.D.Wash. Sept. 30, 2004) (dismissing plaintiff's claim due to bad faith spoliation, and requiring plaintiff to pay defendant the reasonable expenses it "incurred investigating and litigating the issue of [the plaintiff's] spoliation").

The above-described third situation is most relevant to the instant matter;[19] however, Goodman's Motion only has been granted in part and denied in part. Relying on Fed.R.Civ.P. 37(a)(5)(C) for guidance, the Court notes that if a motion is granted in part and denied in part, then a court "*may,* after giving an opportunity to be heard, apportion the reasonable expenses for the motion." *Id.* (emphasis added). Accordingly, within ten days of issuance of this Memorandum Opinion, Goodman will file with this Court an itemized list of reasonable expenses associated with the filing of the instant Motion. In compiling this list, Goodman should take note that as a *pro se* litigant, he is not entitled to attorney's fees. *See Arias–Zeballos v. Tan,* No. 06 Civ. 1268 GELKNF, 2007 WL 1946542, at *1 (S.D.N.Y. June 27, 2007) ("[A]lthough a *pro se* litigant is entitled to the costs incurred in making the motion to compel on

---

**19.** The first situation is inapplicable to the instant matter, as the Court has granted an adverse jury instruction in Goodman's favor; therefore, a punitive monetary award is not required. The second situation also bears no persuasive value; Goodman cannot recover any additional discovery costs because the Court has previously ruled that Goodman's request to perform a keyword search on Tracer/PSI's backup tapes must be denied. The fourth situation lacks relevancy because the Court cannot presume that Goodman, notwithstanding Tracer/PSI's spoliation, would not have chosen to depose Wilson.

which she prevailed, the plaintiff is not entitled to recover what amounts to attorney's fees because one cannot 'incur' fees payable to oneself."); *Eley v. Herman,* No. 1:04–CV–00416, 2006 WL 276741, at *5 (N.D.Ind. Feb. 2, 2006) ("[A] *pro se* litigant is not eligible for the award of attorney fees."). Further, "the time a *pro se* litigant spends making a motion is not included among the reasonable expenses contemplated by Fed.R.Civ.P. 37." *Arias–Zeballos,* 2007 WL 1946542, at *1 (citing *Walker v. Tri–Tech Planning Consultants, Inc.,* 149 F.R.D. 22, 23 (E.D.N.Y.1993)). Tracer/PSI will have five days thereafter to file a response, and Goodman will have five days to file any reply.

## VI. Conclusion

In conclusion, Goodman's Motion is granted in part and denied in part. Specifically, he is entitled to an adverse jury instruction fashioned by Judge Garbis with respect to Tracer/PSI's failure to preserve Marty's laptop and Marty's failure to preserve her relevant emails and documents. The appropriate instruction would be a general adverse instruction that permits, but does not require, the jury to draw an adverse inference against Tracer/PSI as a result of its violation of the duty to preserve relevant evidence. All other requested relief is denied, with exception to Goodman being entitled to seek reimbursement for costs, exclusive of attorney's fees, properly apportioned to the Motion filed and relief received. This Memorandum Opinion disposes of Paper Nos. 138–140.